No. 22,429.

THE STATE OF KANSAS, *Appellee*, v. BRUCE WOODS, *Appellant.*

SYLLABUS BY THE COURT.

1. CRIMINAL LAW—*Burglary—Failure to Instruct upon Circumstantial Evidence—No Request—Waiver by Defendant.* In a criminal prosecution circumstantial evidence alone was relied upon by the state for conviction. No instruction relating to circumstantial evidence was given, and the defendant made no request for instructions of any kind. *Held,* that, while an instruction upon circumstantial evidence should have been given, it was not indispensable in the sense that it might not be waived by the defendant, and that the failure to make such request waived the error in failing to instruct. (*The State v. Winters,* 81 Kan. 414, 105 Pac. 516.)

2. SAME—*Alibi—No Request for Instruction—Waiver.* The general rule applied also to the failure to give an instruction upon the defense of an alibi.

Appeal from Morris district court; ROSWELL L. KING, judge. Opinion filed November 8, 1919. Affirmed.

*A. M. Thomas,* of Topeka, for the appellant; *H. M. Funston,* of Ottawa, of counsel.

*Richard J. Hopkins,* attorney-general, and *Harry E. Snyder,* county attorney, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Bruce Woods appeals from a judgment of conviction upon two counts of an information charging him with

burglary in the first degree and of an assault with intent to commit rape.

The evidence of the state showed that on the night of January 11, 1919, about the hour of 10 o'clock, a man entered the home of the prosecuting witness, Mrs. McCardle. At the time, Mrs. McCardle was in the bathroom engaged in taking a bath. Her testimony follows:

"I heard the kitchen door open. There is a peculiar little squeak to the door, and I heard that turn. I thought it was Roy: I waited a few minutes and then I called, 'Daddy, is that you?' I called two or three times, but there was no answer. Then I thought it must be Harry, my son, and I called to him, but no answer; then I called Roy again, but there was no answer. I got out of the bathtub, opened the bathroom door and looked into a big black face; the light from the bathroom shone on his face. Upon seeing the black face I screamed, shut the door immediately and locked it, and turned to lock the other door, and then I cannot remember what happened, as I was not conscious until one o'clock. . . . All the outside doors except the one in the kitchen were locked. . . . The light in the dining room was on. The bathroom is just west of my bedroom; there is a door in the northwest corner of the bedroom opening into the bathroom. . . . In order to come from the kitchen into my bedroom you would have to go through the dining room. . . . The bathroom has a small window on the north which may be seen from the street east of the house. . . . there was no light in the bedroom. . . . My husband, Roy, and my son, Harry, were uptown. My eye was all black and my lip was all cut and torn from my teeth, and I was bruised on both shoulders and on my body. I cannot say who the person was except that he was black and had horrible eyes. I saw Bruce Woods that night when the sheriff brought him there, but I could not identify him as being the same person who was in the house."

### Mrs. McCardle's daughter, a child of 12 years, testified:

"I was sleeping in my mother's bedroom on the night of January 11, 1919. There was a crash which awakened me, and I heard my mother scream. I called 'Daddy' three or four times, but there was no answer. I got up and went over to the switch to turn on the light . . . but the light would not turn on. I was standing on the south side of the bathroom door in the bedroom . . . just then a man came out of the bathroom; I thought it was dad and caught hold of his coat. It was the right side of the coat that I caught hold of; it was wet and I let go. He went out of the house through the dining room and kitchen. He had on an overcoat and cap, the overcoat came down to his knees. I turned on the bedroom light and went into the bathroom. Mother was all bloody; I got her into a night gown and put her into bed. I shut the kitchen door and called the neighbors. It was ten thirty-five . . . I do not know Bruce Woods and cannot tell whether he was the same man who was in the house."

Several of the neighbors testified to the condition of the bathroom; the door was splintered and broken, and the lock was broken; the tub was half full of water and blood; and there were signs in the room indicating that a struggle had taken place.

The sheriff testified that he went to the McCardle home, and learning that the person who had made the attack was a colored man who had on an overcoat that was wet, he started out to search for him. In company with the deputy sheriff he went to the residence of Tom Woods, defendant's father, who lived three blocks west of the McCardle home. This was about one o'clock in the morning; they found Bruce in bed;

"I told him to get up and put on his clothes and go with me. While he was putting on his clothes I found his overcoat and it was damp along the right tail of it. I took hold of the cuff of the sleeve and it was quite wet. I called Hayden to feel of the coat and he felt of it. I asked him if it felt wet and he said 'It does.' I had Hayden call in the Myers and McIlvain boys and had them feel of the coat. I asked them if it felt wet and they said it did. I took Bruce Woods to the McCardle home, and as we were going there, he never asked where he was being taken or why. . . . Bruce Woods was taken in the room where Mrs. McCardle was lying in bed, but she could not identify him as the same person who attacked her. While we were there Bruce Woods asked me to come outside, and while out there told me that the reason the coat was wet was because he had been fooling around . . . the girl he had taken to the picture show. There was some other discussion there, and I let Bruce go home that night, but arrested him the next day."

The deputy sheriff and three other witnesses examined the defendant's overcoat at the time and found the right side of the coat and the right sleeve wet. Underneath the cuff on the sleeve it was very wet, and the lint that gathers in the bottom of the coat inside the lining was very wet.

The husband of Mrs. McCardle was at the Moss pool hall, playing at the first table. He was called home after 11 o'clock. The pool hall is on the corner of Main and Wood streets, a block and a half from the McCardle home. He testified:

"I could easily be seen from the street as I was playing in the pool hall, as the front has a big glass window."

Mrs. Blowers testified, in substance, that she was waiting for her husband, who was working at the tailor shop that night, two doors west of the pool hall. She was sitting in front of the window in the tailor shop and saw Bruce Woods pass

in front of the shop twice, the first time going west and in about two minutes he went east. It was then five minutes before ten.

The proprietor of the tailor shop testified that he saw Bruce Woods on the north side of Main street in the door of the Masonic hall just opposite his shop. "He spoke to me as I was crossing the street. Later he passed in front of the shop going west, and in a few minutes he passed going east. Mr. Blowers was quitting work, and Mrs. Blowers asked me the time, and I had five minutes until ten." He had known Bruce Woods since the latter was a small boy.

Two other persons testified to meeting defendant uptown about the same time that night. One of them had known him for fifteen years. The state called as a witness the young woman who was with Bruce Woods at the picture show that night. She testified that they attended the first show, and after it was out, went to the place where she lived, about two and a half blocks away. "When we got home we talked about fifteen minutes at the back porch of the house; then I went in the house and went upstairs to my room, taking my clock with me. It was ten minutes until ten. I did not see Bruce Woods any more that evening."

The defendant's father and mother, two married sisters, and a brother-in-law testified on behalf of the defendant. Some of them testified they attended the same picture show, and that the defendant came home before the clock struck ten, and went to bed. His father and mother testified that he went to bed before ten o'clock, and that he did not leave the house until the sheriff took him away. They also testified that they examined his overcoat while the officers were there, and that it was not wet. The defendant testified that he was thirty-four years old, and was born and raised in Council Grove; that on the night in question he took Bernetta Cook to the picture show, and at about 9:15 or 9:30, when the show was out, took her home to Flack's house where she worked; that he went straight home and did not go uptown; that there was a discussion between himself and the officers at the time the sheriff took him in charge about whether his overcoat was wet; that several who examined and felt it said that it was, but that he contended to the contrary, and that in fact it was not wet. He

denied meeting or speaking to the witnesses who testified that they saw and spoke to him on the street that night about ten o'clock; and denied that he passed the tailor shop.

There was no positive evidence that the defendant committed the crime, and the evidence offered by the state was wholly circumstantial. The court gave very brief instructions, and wholly failed to give any instruction respecting the rules in relation to circumstantial evidence. The failure to give such an instruction, and also the failure to give an instruction on the defense of an alibi, are the basis of the errors complained of. The motion for a new trial was overruled April 14, 1919, and thereupon the court sentenced defendant to the state penitentiary. Subsequently, on April 29, the court heard a motion filed by the defendant, asking that the judgment and sentence be suspended for the reason that the court had failed to instruct the jury in writing on the law of circumstantial evidence and on the law with respect to an alibi. The motion was overruled. The overruling of the motion for a new trial, the overruling of the motion to suspend the judgment and sentence, and the failure to give the instructions mentioned, are assigned as errors.

In none of the cases relied upon by the defendant was the failure to instruct upon circumstantial evidence involved or passed upon, although the statutory provision that in charging the jury the court "must state to them all matters of law which are necessary for their information in giving their verdict" (Crim. Code, § 236, Gen. Stat. 1915, § 8157) was considered. The question involved in all of the cases was the failure to instruct upon lesser degrees and lesser offenses embraced in the principal crime charged in the information. The importance of such an instruction has always been recognized, and it has been held that even slight evidence that the crime may have been of a lower grade than the one charged requires an instruction on the law of the inferior offenses included therein. (*The State v. Clark*, 69 Kan. 576, 77 Pac. 287.)

In *The State v. Younger*, 70 Kan. 226, 78 Pac. 429, it was held that instructions contemplated by this section of the statute are those which are indispensable. The whole question, however, has been recently reëxamined in an exhaustive opinion in the case of *The State v. Winters*, 81 Kan. 414, 105

The State v. Woods.

Pac. 516, in which it was held that the statute does not express a public policy requiring the nullification of all proceedings in which it is not strictly observed, but merely prescribes a rule of criminal procedure, the benefits of which a defendant may waive. Even upon so important a matter as instructions relating to lesser degrees and lesser offenses embraced in the principal crime charged, it was held that, generally, the defendant may waive the benefits of the statute by failing to make a timely request for such instruction. After reviewing the previous decisions, the opinion states in the following language the conclusion reached by the court:

"That the statute means what it says and should be followed, but that a duty rests on counsel for the defendant to aid and not to ambush the court, and consequently instructions should be requested covering all lesser degrees or lesser crimes . . . A request sufficient to direct the mind of the court to the subject is enough. Good instructions need not be offered, or a good theory for them formulated; and the evidence itself may point so plainly to the necessity for such instructions that no request is necessary. Generally, however, a failure to make the request waives error in failing to instruct. . . . The statute merely prescribes a rule of criminal procedure the benefits of which a defendant may waive, and which is qualified by another statutory rule that on appeal judgment must be given without regard to technical errors or defects or exceptions which do not affect substantial rights. (Crim. Code, § 293.)" (p. 421.)

What was there said with respect to the duty of counsel for defendant "to aid and not to ambush the court" applies with remarkable force to the facts in the case at bar. Here no request was made for an instruction in respect to circumstantial evidence, nor on the defense of an alibi. In fact, no instruction of any kind was requested by the defendant. Even in the motion for a new trial the attention of the court was not challenged to the failure to instruct upon these matters. Two weeks after the motion for a new trial had been overruled and judgment and sentence had been pronounced, there was filed and presented to the court what was designated as "a motion to suspend the judgment and sentence," and for the first time it was claimed that the defendant's rights had not been protected by the court, and that a new trial should be ordered.

An instruction on circumstantial evidence would have been very appropriate in this case, and should have been given. All the evidence upon which the state relied for conviction was

circumstantial.  But even in a case where the entire testimony of the state is of that character, the failure to instruct upon circumstantial evidence cannot be said to be nearly as indispensable to protect the rights of the defendant as an instruction on lesser degrees embraced in the principal crime charged, where there is evidence that the crime may have been of a lower grade than the one charged.  It follows, therefore, that an instruction upon circumstantial evidence in such a case is not indispensable in the sense that it cannot be waived by the defendant.  The present case falls squarely within the general rule that a failure to make request waives the error in failing to instruct; and, having in mind the other statutory rule, that in this court judgment must be given without regard to technical errors or exceptions which do not affect substantial rights (Crim. Code, § 293, Gen. Stat. 1915, § 9215), we have no hesitation in holding that the defendant can neither avail himself of the failure to instruct on circumstantial evidence, nor with respect to the defense of an alibi.

The judgment is affirmed.